709 P.2d 114

**Patricia J. SMALL, Claimant-Appellant,**

v.

**JACKLIN SEED COMPANY,
Employer-Respondent,**

and

**Idaho Department of
Employment, Respondent.**

No. 14994.

Supreme Court of Idaho.

May 29, 1985.

Patricia J. Small, pro se.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Carol Lynn Brassey, Katharine

A. Gerrity, Deputy Attys. Gen., Boise, for Department of Employment.

BAKES, Justice.

Appellant Patricia J. Small began working for respondent Jacklin Seed Company as a general laborer in March of 1982. Small voluntarily quit her job on August 9, 1982. Small then filed a claim for unemployment insurance with respondent Department of Employment, asserting that she had terminated her employment with good cause based upon allegations of sexual harassment. Her claim was denied. Later, a redetermination issued in which Small was again found ineligible to receive benefits. Small appealed the redetermination to the Appeals Bureau of the Department of Employment. The appeals examiner, after conducting a telephone conference hearing, concluded that Small had failed to establish good cause for voluntarily leaving her employment. Small appealed to the Industrial Commission. The Industrial Commission, without conducting a new hearing and based upon the transcript of the telephone conference hearing, adopted the decision of the appeals examiner. Small appeals from the commission's ruling, arguing that the record does not support its conclusion that she voluntarily quit without good cause.

The sole issue raised on appeal by appellant is whether the findings of the Industrial Commission are supported by substantial evidence. However, apparently through inadvertence the Industrial Commission did not consider all of the evidence which was before the appeals examiner. The record prepared by the Department of Employment and certified to the Industrial Commission contained nine exhibits, but two of the exhibits were not transmitted to the Industrial Commission. The certificate of the Industrial Commission on appeal indicates that only Exhibits 1 through 7 were considered by the Industrial Commission in reviewing the Department of Employment's record. Thus, it appears that Exhibits 8 and 9, although required to be included in the record on appeal before the Industrial Commission, were never forwarded to or considered by the Industrial

Commission in arriving at its decision. Exhibits 8 and 9 are not contained in the commission's record filed in this Court.[1] Exhibit 8 was the employer's "Temporary

1. The dissenting opinion attempts somehow to argue that Exhibits 8 and 9 were before the Industrial Commission and were considered by it. However, a chronological review of the record before this Court conclusively establishes otherwise.

The register of actions reflects that on May 17, 1983, the Industrial Commission Clerk's Record was received and filed by the Clerk of the Supreme Court. The Certificate of Exhibits contained in the Clerk's Record lists the exhibits offered or admitted into evidence during the proceedings before the Industrial Commission. That certificate, as prepared and certified by the secretary of the Industrial Commission and filed with the Supreme Court, listed only seven exhibits. Exhibits 8 and 9 were not set out in the Certificate of Exhibits as filed by the Industrial Commission clerk with the Supreme Court. A full photocopy of the Certificate of Exhibits as it appeared when filed with the Supreme Court on May 20, 1983, is as follows:

## CERTIFICATE OF EXHIBITS

### DEPARTMENTAL EXHIBITS

1.        Claimant/Employer Separation Statement

2.        Employer's Statement

3.        Determination

4.        Request for Redetermination

5.        Employer's Reply

6.        Redetermination

7.        Appeal of Benefit Redetermination

TRANSCRIPT ON APPEAL (Hearing before Appeals Examiner)

I, the undersigned Secretary of the Industrial Commission, do hereby certify that the foregoing is a true and correct list of all exhibits offered or admitted into evidence during the proceedings before the Department of Employment and during the proceedings before the Industrial Commission.

DATED at Boise, Idaho, this 14th day of April, 1983.

*Patricia S. Ramey*
Patricia S. Ramey, Secretary

On that same date, May 17, 1983, the Supreme Court received Exhibits 1 through 7 which were before the Industrial Commission.

Thereafter, on December 28, 1983, the register of action reflects that the Clerk's Office received Exhibits 8 and 9 which were placed in the envelope with the exhibits received on May 17, 1983. It was apparently at this time that the two handwritten numbers, 8 and 9, were added by personnel in the Supreme Court Clerk's Office to one of the three copies of the Industrial Commission's Clerk's Record which had been filed seven months earlier. The Certificate with the handwritten additions is as follows:

## CERTIFICATE OF EXHIBITS

<u>DEPARTMENTAL EXHIBITS</u>

1. ✓   Claimant/Employer Separation Statement

2. ✓   Employer's Statement

3. ✓   Determination

4. ✓   Request for Redetermination

5. ✓   Employer's Reply

6. ✓   Redetermination

7. ✓   Appeal of Benefit Redetermination

✓ TRANSCRIPT ON APPEAL (Hearing before Appeals Examiner)

8. ✓

9. ✓

I, the undersigned Secretary of the Industrial Commission, do hereby certify that the foregoing is a true and correct list of all exhibits offered or admitted into evidence during the proceedings before the Department of Employment and during the proceedings before the Industrial Commission.

DATED at Boise, Idaho, this 14th day of April, 1983.

*Patricia S. Ramey*

Patricia S. Ramey, Secretary

The register of actions does not reflect from whom the two exhibits, 8 and 9, were received; however, the Court file contains a letter dated January 4, 1984, from the Clerk of the Supreme Court to the attorney for the Department of Employment stating that Exhibits 8 and 9 were being returned to "you," presumably where they came from. That letter states in full:

"January 4, 1984

"Carol Lynn Brassey, Deputy Atty. Dept. of Employment Statehouse Mail Boise, ID 83720

"Re: Small v. Jacklin Seed, No. 14994

"Dear Ms. Brassey:

"As we discussed, I am returning to you the Temporary Employee's Handbook by Jacklin Seed Company and copies of pictures sent us as Exhibits 8 and 9 in this case. Initially, we filed these exhibits together with the other seven exhibits. *However, Pat Ramey of the Industrial Commission advised me that these documents were not included as exhibits before the Commis-* sion. Under the circumstances I feel it is inappropriate for our office to include them as exhibits.

"As you point out, they were, however, admitted as exhibits before the appeal section and intended to be exhibits in the proceeding. You may wish to consider filing a Motion to Augment or other form of Motion with the Court, if these documents are to be included in our appeal record. If you do file a Motion, May I suggest that an explanation be included concerning the documents and their handling. I apologize for any inconvenience this may cause you but under the circumstances, I do not feel that we can include them as exhibits in our appeal at this point. If I may be of any assistance to you, let me know.

"Best personal regards.

Sincerely,

/s/ Frederick C. Lyon

Clerk"

(Emphasis added.)

Employees Handbook," and Exhibit 9 was a photocopy of pictures taken by claimant's supervisor who allegedly inflicted the sexual harassment. The pictures allegedly were of women, including claimant, in bent over positions while working in the fields, offered to illustrate the supervisor's alleged preoccupation with sexual matters.

Considering the sensitive nature of the appellant's claim in this appeal, *i.e.*, that she had good cause to quit because of sexual harassment, and considering the marginal quality of the transcript of the telephone conference hearing held before the appeals examiner which was the basis of the record before the Industrial Commission, it is the conclusion of this Court that the apparent omission by the Industrial Commission to consider Exhibits 8 and 9 requires this Court to remand the case to the Industrial Commission for reconsideration. The commission may well want to consider a new hearing to obtain an accurate record from which to evaluate appellant's case, considering the apparent inadequacies of the telephone conference record presently before the Court.

Remanded to the Industrial Commission for further proceedings. No costs allowed.

DONALDSON, C.J., and HUNTLEY, J., concur.

---

The January 4, 1984, letter states that the Clerk of the Supreme Court was advised by Pat Ramey of the Industrial Commission that "these documents were not included as exhibits before the Commission." That statement is consistent with the Certificate of Exhibits signed by the secretary of the Industrial Commission, which did not certify Exhibits 8 and 9 as being before the Industrial Commission.

After Exhibits 8 and 9 were returned to the attorney for the Department of Employment, the Department of Employment filed a Motion to Augment the record before the Supreme Court by including Exhibits 8 and 9 with the other exhibits which were certified to the Supreme Court by the Industrial Commission. That Motion to Augment was supported by an affidavit of Betty Silberg, the legal assistant and custodian of the records for the Legal Bureau of the Department of Employment, who stated in the affidavit, "That it was my duty to transfer

SHEPARD, J., dissents without opinion, and would affirm the order of the Industrial Commission.

BISTLINE, Justice, agreeing only that the decision of the Commission cannot stand, but not for reasons stated by the majority.

Although the majority opinion will read well to those two thousand attorneys who do not see the record and see only that the claimant is not entirely disenfranchised of her right to benefits, on even a cursory review of the appeal record the reader finds himself on Tobacco Road. The Department of Employment contends that the examiner's findings, as adopted by the Industrial Commission, were supported by substantial evidence. The examiner found that Patricia Small had quit voluntarily without good cause, hence she was not entitled to unemployment benefits. The crux of the matter is whether the claimant had good cause to leave Jacklin Seed Company when she did. The appeals examiner for the Department of Employment concluded that she did not. That determination was made following a telephone conference hearing. Not only did the appeals examiner not see the witnesses, but neither did the Industrial Commission, which in turn simply endorsed the decision of the appeals examiner without any hearing whatever. In turn, a majority of this Court

the exhibits in the above-entitled matter to the Industrial Commission ...," and "That I fully intended to send every exhibit in the record to the Industrial Commission but, that through inadvertence, I failed to forward Exhibits 8 and 9 to the Commission."

Based upon this uncontested record demonstrating that Exhibits 8 and 9 were not before the Industrial Commission, the Supreme Court, on March 20, 1984, entered an Order denying the Motion to Augment the record, and denying the inclusion of Exhibits 8 and 9 as part of the exhibits received from the Industrial Commission.

The record in this action conclusively establishes that Exhibits 8 and 9 were not before the Industrial Commission when it decided the case, nor were they certified to this Court as exhibits which were considered by the Industrial Commission. The assertion to the contrary in the dissenting opinion misconstrues the record before this Court.

has avoided meeting the issue presented, notwithstanding that the five of us are as equally competent and capable as the three commissioners to independently review a cold record. I am appalled at the result and the system which has produced it.

Cumulative evidence of sexual harassment, intimidation, badgering, mistreatment, and provoking of the claimant, along with other co-workers in her presence, is grounds for any reasonable employee to leave a job and look for other employment. The claimant more than amply demonstrated that she was so subjected by an employee in a supervisory capacity and by him stripped of, if not her clothing, the dignity to which any human being in this country is entitled—whether a field hand as here, or a secretary to an executive. The *employer*, on the other hand, *did not produce one single witness* who testified that the claimant's testimony was exaggerated, inaccurate, unfounded, or untrue.

A well-settled rule of law is that the burden of proving and establishing statutory eligibility for unemployment rests with the claimant. *Pyeatt v. Idaho State University*, 98 Idaho 424, 565 P.2d 1381 (1977). Further, an employee who voluntarily quits must have had good cause in order to be eligible for unemployment benefits. I.C. § 72–1366(e). The ultimate question in a voluntary quit case, then, is what constitutes good cause to abandon employment, and the case law reflects that in Idaho this has been a difficult standard to meet.[1] The test for good cause was set forth in *Burroughs v. Employment Security Agency*, 86 Idaho 412, 387 P.2d 473 (1963), and reiterated in *Fong v. Jerome School District No. 261*, 101 Idaho 219, 222, 611 P.2d 1004, 1007 (1979):

In order to constitute good cause, the circumstances which compel the decision to leave employment must be real, not imaginary, substantial not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances. The standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive; ....

This standard was elaborated upon in *Boodry v. Eddy Bakeries Co.*, 88 Idaho 165, 170, 397 P.2d 256, 259 (1964), wherein this Court stated:

A construction of "good cause" as used in I.C. § 72–1366 must not be extended to include purely personal and [subjective] reasons which are unique to the employee—it must require that such case is not a condition which by common knowledge is usual where accompanied by minor irritations.

The parameters of reasonableness are difficult to outline and the courts generally agree that a case-by-case determination is necessary. A review of decisions involving menacing employers or harassment of employees provides some guidelines for understanding what behavior must reasonably be tolerated by an employee, and what behavior need not be tolerated. In *Stewart v. Dept. of Industrial Relations*, 40 Ala.App. 383, 114 S.2d 274 (1959), the court held that abusive language alone is not good cause to quit a job. Similarly, yelling and screaming at all employees, without any arbitrary or discriminatory selection of which employees were subject to harassment does not constitute good cause to leave a job. *Uniweld Products, Inc. v. Industrial Relations Com., Florida Dept.*

---

1. A thorough but not exhaustive review of the voluntary quit cases in Idaho reveals that no claimant in Idaho has been able to convince this Court that his grounds for leaving constituted good cause. *See, Berger v. Nez Perce Sheriff*, 105 Idaho 555, 671 P.2d 468 (1983); *Ellis v. Northwest Fruit & Produce*, 103 Idaho 821, 654 P.2d 914 (1982); *Rogers v. Trim House*, 99 Idaho 746, 588 P.2d 945 (1979); *Fong v. Jerome School District*, 101 Idaho 219, 611 P.2d 1004 (1979); *Stone v. South Hill Chevron*, 99 Idaho 162, 578

P.2d 1093 (1978); *Flynn v. Amfac Foods*, 97 Idaho 768, 554 P.2d 946 (1976); *Clay v. Crooks Industries*, 96 Idaho 378, 529 P.2d 774 (1974); *Toland v. Schneider*, 94 Idaho 556, 494 P.2d 154 (1972); *McMunn v. Department of Public Lands*, 94 Idaho 493, 491 P.2d 1265 (1971); *Boodry v. Eddy Bakeries Co.*, 88 Idaho 165, 397 P.2d 256 (1964); *Burroughs v. Employment Security Agency*, 86 Idaho 412, 387 P.2d 473 (1963); and *Roby v. Potlatch Forests*, 74 Idaho 404, 263 P.2d 553 (1953).

*of Commerce,* 277 S.2d 827 (Fla.App.1973). Nor does a sexist attitude by an employer provide grounds for good cause to quit employment. *McCain v. Employment Div.,* 17 Or.App. 422, 522 P.2d 1208 (1974). And, being given the "cold treatment" by a supervisor is not good cause to leave one's job. *Citizen's Bank of Shelbyville v. Industrial Com. of Missouri,* 428 S.W.2d 895 (Mo.App.1968).

However, abusive language plus some additional mistreatment is considered good cause to quit voluntarily, entitling a claimant to unemployment compensation. Case law in this area provides interesting examples of what type of behavior falls within the category of mistreatment. In *Associated Utility Services, Inc. v. Board of Review,* 131 N.J.Super. 584, 331 A.2d 39 (1974), the claimant was continually harassed and mistreated by her employer, including undue scoldings at work, and being called at home and yelled at. Even after claimant objected to this treatment indicating that the harassment bothered her, the mistreatment continued. The court concluded this was good cause to quit. Similarly, arbitrary and discriminatory treatment of a bank teller provided good cause for leaving. *Wilson v. Doyal,* 319 So.2d 855 (La.App.1975). In this case, the claimant was required to balance her accounts after hours, while other tellers were allowed to balance during the day. She wasn't paid for her overtime, nor was she paid for her sick leave. Under these circumstances the court determined it was reasonable for the claimant to leave voluntarily.

Employees are also not required to continue in a job where they are subject to unjust accusations, abusive conduct and profane language. *Electric Reactance Corp. v. Unemployment Compensation Board of Review,* 169 Pa.Super. 269, 82 A.2d 277 (1951); *Willet v. Commonwealth, Unemployment Compensation Bd. of Review,* 59 Pa.Cmwlth. 500, 429 A.2d 1282 (1981). In *Willet, supra,* the claimant was subject to profanity and verbal ridicule, alleged job infractions which were later found to be unsubstantiated, unjust accusa-tions, and generally abusive conduct. The court concluded this constituted good cause to quit. And, in *Arufo v. Commonwealth, Unemployment Compensation Bd. of Review,* 37 Pa.Cmwlth. 555, 391 A.2d 43 (1978), the claimant quit when she was accused of theft after an audit had cleared her name. The court held this was good cause to leave.

The record before us demonstrates that Patricia Small was subject to treatment that would readily constitute good cause for quitting in any state other than Idaho. The following excerpts from the hearing examiner's telephone conference with the claimant shows that she was subjected to a *continuous* pattern of abuse by her immediate supervisor after having turned him in for sexual or sexual-related harassment which she tolerated longer than any person should have to:

"Q. [Hearing Examiner]: Okay. What were the reasons that you quit?

"A. [Ms. Small]: All of his subtle comments, subtle remarks to me and many of the other female workers. Things he pulled on some of them. His constant harassment after we made a complaint against him.

"Q. Okay, I don't understand, what do you mean "his subtle comments." What does that mean?

"A. Subtle sexual comments.

"Q. Okay, can you, can you give me some, can you give me any, well, not an example, can you tell me specifically of a time that he said something that you took offense to?

"A. Telling me that I liked screwing, when I was screwing a nut and bolt together, telling me that, well, Pattie's a good screwer, she likes screwing. Comments like sticking, putting his arm constantly around you, sticking paychecks down (inaudible). Making, holding your paycheck above his head, trying to get you to jump up and down to get it. Telling me that he didn't like, I asked him, when I was first hired on, why he didn't hire male employ-

ees. He state the reason he doesn't hire male employees because males have a tendency to grab ass and that was what he was out there for. Also, constantly threatening me, to fire me, over cigarette smoking. Over visiting people at the farm shop. Because he didn't like them. Making comments about sex.

"Q. Okay, can you go back over that? You, you said something about what he told you when, when you were hired about not hiring male employees. Would you repeat that, I couldn't hear it?

"A. I said when Ray hired me, I, we were talking about research, and what my job would be doing. And I asked him why he didn't have any male employees on his research crews. He said males, and I am quoting. He said, "Males have a tendency to play grab ass, and that was what he was out there for." Unquote.

. . . .

"Q. I see. Okay. What, now, I understand that you quit them because of these sexual harassment type problems. Were there any other reasons?

"A. Unequal treatment of workers. *Harassment. After we made the complaint.* Making us do harder jobs. Being harder, with a harder method of doing it.

"Q. Anything else?

"A. Constant duress from being fired over everything.

"Q. By who?

"A. By Ray Perry.

"Q. Did he ever threaten to fire you?

"A. Yes. Many times.

. . . .

"One time, let's see, what time it was, April 29, we were working (inaudible) at across the free way at Jacklin, on Jacklin's property, hoeing around plants. Me, Brook, and Sandy was working overtime. Ray came out, he helped, helped us, he came over to me, grabbed me, giving me a bear hug. He is 6 foot 3. Almost 200 pounds. And I told him to let me go. I couldn't move so I bit him in the chest. He backed off and said wow, you don't mess

around do you. May 5, Ray and I were going up to Post Falls fields so that he could show me the spring that I had done. The job I had done earlier that year. Got in the pickup, started out. Ray asked me why everybody back at the (inaudible) was smiling and grinning when, I quote, was it because he wanted, he wanted to know was it because they all wanted to know who gets to go into the bushes with me. End quote. And . . .

. . . .

"Q. Okay. Ms. Small, would you go back over that last part, please?

"A. Okay. We were going out to the Post Falls fields. I had just been spraying earlier that year. We got in the pickup and stated out. Ray asked me why everyone was smiling when we left. I quote Ray saying, "Was it because they all want us to know who gets to go into the bushes with me." End of quote. I got upset and told him no. You want just incidents with just me, right?

"Q. Yes.

"A. Okay. Ray would make, we were digging drainage holes. We would be digging them with little hand shovels and standard shovels, digging six-foot holes. It took five of us girls over a the week and a half to dig three holes. Later, there was something else that, we would ask Ray if we could (inaudible). We told Ray he was wasting company time. And he said if we couldn't go do something he'd get somebody else to do it. Ray would just comment saying you girls like being in the hole anyway don't you? On May 14, went over to get a cigarette out of my mouth, we had a luncheon out at one of the fields in Post Falls for Vicki's birthday. Ray was standing by the truck. I went in to light my cigarette. Ray lunged at me saying, are you still smoking? He had his whole body up against mine. Had me pinned against the truck. I gave him a dirty look and said, fine, I won't smoke, and he backed off. Also, also on May 27, we were working on those (inaudible) again, hoeing around plants, (inaudible) had been work-

ing with us. She finished and headed back into the office. I went back in with her to go to the bathroom. I thought I was having a menstrual accident. Ray gave me a ride back up the field, and on the way back out to the field I told him, he asked me if I liked to screw off or if I liked stalling time or what. I asked Ray, I told Ray, no, it was that time of the month. Ray looked at me and says what do you mean that time of the month? I had to come right out and tell him I was on my period. I'm not the only girl that that's happened to. He, everybody had to. We would tell Ray that we would be out picking rocks. (Inaudible.)

"Q. Were there any other incidents?

"A. Yes, still some here. He was constantly calling us "his" girls. And putting his arm around us. Patting us on the butt. Calling us Jacklin whores as in prostitute. Taking pictures of our butts. Butt shots, hip shots. Constantly taking pictures. He wouldn't show us the pictures. He showed us one set of pictures out of all the pictures he took. Showing Jacklin (inaudible) pictures he took weren't supposedly the pictures he was supposed to be taking.

"Q. Did he take the pictures while you were working?

"A. Right. Telling me that each blonde and brunette was more beautiful than the other and that he would treat each one differently. Telling girls that if he was 30 years younger he'd be chasing after them. Asking if he, you know, you wouldn't want to go to bed with a 30-year-old man, would you? We got a pay raise Ray came, Ray would tell us that if we told anybody about the pay raise we would be fired.

. . . .

"Q. Okay. Well, then you quit later on, not because of the sexual harassment, because of other things he did?

"A. General, yeah, his harassment because of what we had, because we were people and we decided to finally speak up.

"Q. *And when you spoke up, did he stop the sexual harassment?*

"A. *He rode us twice as hard in every other way.*

"Q. No, I asked you if he stopped the sexual harassment when you spoke up?

"A. In his way.

"Q. Well, nothing occurred after June, correct?

"A. He would still make subtle comments.

. . . .

"Q. Ms. Small, what happened in regard to, what happened between the time the sexual harassment stopped and the time that you quit? Was, he said you were pressuring you, is that correct? I'm sorry, I couldn't hear you.

"A. Yes.

"Q. Okay. What did he do. What, what do you mean by pressuring you?

"A. Pressuring, telling us that we weren't, we weren't doing jobs the right way. Telling us that every time there was a screw up it was our fault. When we would only be following orders from him. Telling us to go out and do a job again because we didn't do it right the first time when it, it was done. Having us do things the hard way rather, if there was an easy way, he would have, rather than using equipment or things like this, he would have us do it that way.

. . . .

"A. . . . which is a small hand operated machine. You know, to run through some variety types of (inaudible), and he pulled me off of that and had me sickling behind a building which has no, no one can see. And he told me that I wasn't allowed to take a break or anything until it was done. Which was more than a one-day job. (Inaudible) sending us out into a pack of bees to sickle out (inaudible), right in the middle of the day, sickling off (inaudible). Except that it wasn't supposed to be in there. When there was bumble bees and honey bees everywhere. There, myself, I am allergic to bees. He knows it. I've told him that in the past. And, he stood right in the

field saying, what, I don't see any bees. And there was bees every two feet.

"Q. Did he ever assign work to ...

"A. ... (inaudible) those that are death-ly, aller-, afraid of bees, and it's very dangerous to have them out there in the fields sickling behind you when they're so scared of bees it's not funny.

"Q. Now, did he ever give you work to do that wasn't in your job description, or what you weren't hired for?

"A. That could cover everything, so no.

"Q. You were hired, then, to do everything that needed to be done in those fields?

"A. Pardon?

"Q. You were hired to do everything that needed to be done in those fields, then?

"A. Basically, yes.

"Q. Okay. Did that include working around bees?

"A. I really don't know. It's not safe if you've got allergic people working around bees.

"Q. I see. Did you tell him you were allergic?

"A. Yes.

"Q. Did he offer to give you other kind of work?

"A. No, he did not, he said he did not see any bees."

With reference to the supervisor's treatment of other employees, Patricia Small testified as follows:

"A. I'm aware that I am talking about somebody else, but I want to point out that the fact of how many incidents there's, he [Ray Perry] did toss girls down, tried tickling them, tried kissing them. Ripped the blouse off of another girl. Am I suppose to sit around and wait for him to do the same thing to me?

. . . .

"Q. And I want to know only those things you heard before you quit.

"A. Right. Oh yes. I mean I didn't (inaudible). Sandy and Ray went to Nez Perce. Sandy was, Ray tossed Sandy on the bed that evening. Tickling her. Tried to kiss her. She told him that if he didn't get off of her she, she was going to wet his bed. And he got, he was, that's when he bent down to kiss her. She looked away and said that's enough and to get off of her. So he got off. She got up and left the room. He tossed two girls down, tossed one girl down in the little office, more than one time. (Inaudible) climb on top of her. Was trying to do some things with her. Tried to kiss her. She would tell him to get off and leave her alone. He ripped a girl's blouse off while she was out in the field. The girl was upset, she came back into the other (inaudible). He ripped the blouse off out in the field. She came back into the office, she was crying. And very upset.

"Q. Did that particular girl tell you that that had happened?

"A. Yes, she did.

"Q. I see.

"A. She does not want to testify for fear she will ...

"Q. Okay, you don't need to get into that. I just wanted to know if she told that.

"A. Yes.

"Q. Anything else you'd like to tell me?

"A. Telling Vicki Hutchins, Vicki Wolkenhauer that he would like to take her behind a, asking her if she wants to go behind (inaudible) bush, she said, you know, (inaudible). Having the girls having to exactly say that they were on their periods. Coming right out and saying that (inaudible). Us girls were picking rocks out at the access road. These were very big rocks. It would take three and four girls to lift the rocks up. To a truck neck level high. And the fact that, that we would go in and tell Ray that even males could not handle picking such big rocks all day. And he would say, you know, (inaudible). We went in and told him, in one specific incident on June 1, that us girls

could not handle picking those rocks all day, and three of us on our period. And, that somebody might get hurt. He said too bad, to go out and finish it anyway. I know I got pretty sick that evening. On June 8 the photographer came out to Jacklin. Took some pictures of Ray. Of four of us girls, not Ray. Four of us girls (inaudible). And, he said he would come back at noon and needed, that he would show us the negatives then. And when Ray came out, he tried to grab the negatives out of the guy's hands, causing a scene with the guy. I understand Jacklin had to make a formal apology over it. Telling this guy, you know, he was telling this guy to not to take pictures. Telling him that no one's allowed to take pictures of his girls, quote, unquote. The next morning (inaudible) showing what the, the, what the photographer had taken. Ray, it was the first time Ray had ever shown us any of the pictures out there. And he was taking them all the time (inaudible) like lifting the tiller on the ones that I do have evidence of. He, he showed us the pictures that day. I had a split in my pants, and he'd gotten all, all these (inaudible) and he was making comments like, that was the best side of Patty, you know. Best side of Patty. When any, there was two other girls out there that have 35 millimeter cameras like he does. And if we were, attempted to take a picture, if we quit more than two seconds (inaudible), he would say no, you can't take any pictures. June 10, a guy dropped off the truck drivers hauling gravel in and out of (inaudible) road. We were hauling (inaudible) from one end of the field to the other with a wheelbarrow with a flat tire. It was in the hundreds that day. This guy dropped off a pop. He just, we were out, clear out in the field. There was no way that any of us could have talked to him. He waived the pop at us. Set the pop on the truck and took off down the road. Later that afternoon, Ray came out and he said, he had seen the incident. He had come over and he said you girls are not allowed to accept pop from anybody. If you want pop, there's pop in the machine and you can get it then.

And yet we weren't, you know, we weren't supposed to go in for breaks or we'd get hollered at. He said that if, if we needed pop he would bring it to us on his discretion. He, and when I asked him that we had heard rumors that he had tried to get the guy fired. When I, when I asked him why he tried to get Jeff fired, all he had to say was well, that guy's only after Judy's big tits anyway. Constantly squeezing girls' chests.

"MARILYN DEUTSCH: I can't hear, Mr. Burgoyne.

"Q. Now, I couldn't hear either. What's that?

"A. Constantly squeezing girls' chests. Like I said chasing paychecks down. Trying to get you to jump up and down for him. Taking everything you say in a sexual manner. Like, so you're hot huh? How hot are you? Do you need cooling off? He would always wear, constantly wear dark glasses, even inside a building. You could never tell where he was looking at.

"Q. I asked you what made you decide to quit on August 6.

"A. 'Cause I had, I had heard from Sandy Semanko that Ray said that I was a troublemaker and an instigator. That he had been talking to Leah, and Leah and Ray had decided that this was what I was...."

(Emphasis added.)

Witnesses for the claimant testified regarding the supervisor's behavior:

"Q. Ms. Semanko, did, were you ever personally involved in any problems of a sexual harassment nature with Mr. Perry?

"SANDRA SEMANKO [Claimant's witness]: Yes, I was.

"Q. Okay, would you tell me about it and when it occurred?

"SANDRA SEMANKO: Before I go into the big incident that was the topper of everything, I'd like to say a few things that happened before, too.

"Q. Well, just, just tell me about the ones that occurred during the summer of 1982.

"SANDRA SEMANKO: Okay. Ray used to always tell me that he wished he was 30 years younger so he could snatch me up to be his gal. And he used to state to me that I had pretty bedroom eyes. And he used to ask me if I knew all about the birds and the bees. And, he, one time on June 11, there was Arden Jacklin's retirement party. And afterwards, I was supposed to set the main lines off to the sprinkler system. And, Ray set the lines off on the access road for me and I went across the highway to set the other ones off. And while I was out there Ray came out and again asked me what was wrong with the crew. And I told him it was him. The girls were tired of his attitude and his constant nagging over breaks or telling us, you know, to hurry up and get the job done whether we were ahead of schedule, when we were ahead of schedule. And he proceeded to tell me that he had to fight his feelings toward female employees, and that at times he would like to take each one behind a bush to make whoopee with them. And, I told him he was in no position to be thinking (inaudible) thoughts about his employees. Especially for the fact that he was married. And, I told him he best, you know, just let things alone because they might cause problems if they already hadn't. And he said, well, I realized the other day when I pinched your butt and you told me to leave your hands, my hands off you, I realized then that you had more morals than I thought. And ..."

As this record indicates, the claimant was subject first to sexual harassment by her supervisor. After filing a complaint with the company over the sexual harassment, claimant admits that the more obvious sexual harassment stopped, but was replaced by a pattern of behavior that can only be characterized as abusive, discriminatory, retaliatory, and frankly, outrageous. I cannot imagine more demeaning circumstances under which to be employed, and it is difficult to envision what would constitute good cause if this does not.

In *Stevenson v. Morgan*, 17 Or.App. 428, 522 P.2d 1204 (1974), the court determined the claimant had good cause to voluntarily quit because she had been subject to continual harassment by her supervisor, treated in an antagonistic and vindictive manner, and had been required to use antiquated methods of conducting business when a newer, more modern, and easier method was available. After complaining, she was told she would just have to live with it. Similarly, Ms. Small and her co-workers were verbally abused by their supervisor and required to do physically demanding work that could have been accomplished using modern machinery. Another Jacklin Seed Co. employee testified about the work Ms. Small and her crew were required to do:

A. [Mr. Hoffman]: Okay. As far as the holes went, they were digging on them for about a week, week and a half. Somewheres in there, by hand, during the hottest part of the day. And, finally, until there was so much complaint raised from other departments, including the ranch, that they got a backhoe in to dig the last hole which took about 10 minutes to do. You know, something they'd been working on for about a week, week and a half during the hottest part of the day. And, also, as far as the rock picking went, they were picking this ground that we were just breaking up. The ranch was breaking it up for research, you know, it was really rocky. And they were out there hand picking it until there was a lot of stink raised over that. And then we took down the rock pickers that picked the smaller to the medium sized rocks out of it. But even then they had to hand pick the bigger rocks instead of having the ranch crew down there picking up the bigger rocks, they were doing it, he was having the girls do it by hand. As far as those, they were hand (inaudible) which they, you know, to put in sacks and stuff because it's a research seed. They were doing this during the hottest part of the day. And as far as those weeds she was talking about, that they were out there pulling weeds out of these, what I want to call weed, it really

stunk bad. There were a lot of bees down in there. And it was always during the hottest part of the day until there was a bunch of complaints raised. And, finally, this other crew of, what I'll call spray girls, they were helping out the research girls, they finally complained enough where they could stop at noon. But, usually the other girls, the research girls would still have to be down there screwing around. So, you know, which she says, as far as that part, I have seen that.

Under *Stevenson, supra,* this sort of treatment, combined with the abusive language, would have been good cause to quit.

The testimony of Patricia Small and her witnesses was unrefuted by the representatives of Jacklin Seed. Jacklin put on no witnesses who testified that the statements of Ms. Small or any of her witnesses was untrue, fabricated, exaggerated, or false. Rather, Jacklin Seed's representative attempted to twist the meaning of one witness's words through semantic questioning:

Q. I'd like to clarify the term "Jacklin whores." Are you spelling it W–H–O–R–E–S or are you spelling it H–O–E?

A. [Vicki Wolkenhauer, Claimant's witness]: W–H.

Q. And he specifically said that rather than making it sound that way when he was really saying hoers?

A. No. I told him I was not a whore. Don't ever call me that again.

Q. That's all the questions.

Jacklin's defense was based primarily on the theory that Ms. Small was a field worker and had never been asked to do anything but field work, and that the supervisor's demands that jobs be done in certain ways or done over was the usual function of a supervisor.

The undenied testimony of the claimant and her witnesses demonstrates good cause to voluntarily leave a job. The test of reasonableness was met because of the continuous pattern of antagonism, verbal abuse, threats of firing, and oppressive working conditions. We should rule today that, as a matter of law, verbal abuse, intimidation following sexual harassment, and threats of firing are good cause to voluntarily leave a job. I cannot believe my colleagues on this Court think otherwise.

Constant threats of being fired are alone an element of good cause in determining if benefits should be awarded. In *National Furniture Mfg. Co. v. Review Bd. of Ind. E.S.D.,* 131 Ind.App. 260, 170 N.E.2d 381 (1960), the claimant quit his job as a truck driver because he believed he was going to be fired and didn't want a record of being discharged. The Indiana court held this was good cause to leave a job and awarded benefits. Likewise, Ms. Small quit her position with Jacklin Seed Co. because of a steady stream of abuse and threats of being fired. When questioned by the hearing examiner as to why she did not complain when she quit, she responded:

Q. How come you put up with this guy for so long, Ms. Small?

A. Because I have a family to support. And I, the way the job conditions are, it is very, very hard to find a job. I was totally aware of that when I left.... I have two small children to help support at the time. At the, the last two, the last week in August I had taken a week off to start divorce procedures. So I was totally aware I was going to have to support two children by myself on Jacklin's income, and I was determined I could do it.

Several courts have ruled that good cause to quit also includes a number of factors which focus on whether the employee took appropriate steps to prevent the mistreatment from happening. *See* Annot., 76 A.L.R.3d 1089 (1977), and cases cited therein. These steps include informing appropriate managerial personnel of problems, *Stewart, supra; Coduvell v. Commonwealth, Unemployment Compensation Bd. of Review,* 48 Pa.Cmwlth. 185, 408 A.2d 1207 (1979); *West v. Commonwealth, Unemployment Compensation Bd. of Review,* 53 Pa.Cmwlth. 431, 417 A.2d 872 (1980), or transferring to another depart-

ment to alleviate conflict, *McMunn v. Dept. of Public Lands*, 94 Idaho 493, 491 P.2d 1265 (1971).

The record before us shows that claimant attempted to complain to the appropriate management personnel in spite of the fact that there was tremendous confusion over whether employees received an employee handbook and whether there were company procedures for registering complaints. Further, claimant also requested a transfer to another department when things became intolerable:

I did try to transfer over to another department, and that was on, that was also in the last two weeks in July. I tried to transfer to another department. Cas Hoffman, I talked to Skip Eller. Cas Hoffman was standing right there. He can verify this for me. That I tried to transfer to another department. Skip told me at that time there was no openings and it probably would be a couple months before I could be hired, hired on over there.

This requested transfer was verified by claimant's witness. These actions show that the claimant attempted to alleviate a difficult employment situation through company channels before she left. Only after these attempts to rectify the situation failed did the claimant voluntarily leave her job. The actions of the claimant conform admirably to the policy of the unemployment law in this state which was set forth in *Custom Meat Packing Co. v. Martin*, 85 Idaho 374, 384, 379 P.2d 664, 670 (1963): "The policy of the law is to encourage the employer and employee to adjust their differences and thus avoid interrupting the employment." Ms. Small's filing of a complaint through company channels and request of a transfer to another department indicate good faith on her part to avoid

unemployment.[2] I challenge the majority to suggest what more Patricia Small could have done to adjust differences with her supervisor and avoid interrupting employment.

The majority avoids doing so by the expedient of searching through the record to find an escape route, a disposition whereby it does not have to face up to the record before us—a proposition to which I shall turn later.

Putting aside the court's ill-advised opinion in *Booth v. City of Burley*, 99 Idaho 229, 580 P.2d 75 (1978), what I would suggest is that the majority, as have many courts, misapprehends what is encompassed in a question of law, *Citizen's Bank, supra*, at 898; *Taylor v. Unemployment Compensation Bd. of Review*, 474 Pa. 351, 378 A.2d 829 (1977). It is not a question of fact, and it is our job to determine whether, as a matter of law, Patricia Small had good cause to leave her position. The Court this day should quickly and responsibly rule that as a matter of law Patricia Small was abundantly possessed of good cause to voluntarily quit. Absent sexual harassment, the intimidation was more than any worker should have to endure.

Intimidation is limited to those extreme cases of verbal abuse, false accusations, threats, and oppressive working conditions, and does not include disagreements over policy or differences in professional judgment. Nor does it include small personality differences which are inevitable in the working world. Agreed. But I cannot comprehend how the Court can stand by today and not accept that Patricia Small did have good cause to leave. She had been subjected to continual harassment, threats, verbal abuse, profanity and intimidation.

2. *See* Annot., 76 A.L.R.3d 1089 (1977), wherein it is suggested that good cause is based not only on an objective standard ("reasonableness"), but also on the good faith of the employee involved. The employee must show an absence of fraud and the presence of a genuine desire to work. Hence, even if the average employee would have quit, this employee cannot collect unless

he acts in good faith. *Id.* at 1091. Patricia Small's attempts to remain at Jacklin Seed through her actions to address the problem through a formal complaint procedure and by requesting a transfer indicate good faith on her part to preserve her job with Jacklin Seed Company.

As a matter of law this amounted to good cause to quit.

As an exercise (probably a futile one), it is interesting to track the uncontradicted evidentiary facts of Patricia Small's conditions of employment against the brief submitted by the Department. Turning to page 5:

One of the purposes of the unemployment compensation law is to encourage the stability of employment and one method of accomplishing such a goal is to discourage voluntary termination of employment without good cause.

In order to constitute good cause, the circumstances which compel the decision to leave must be real not imaginary, substantial not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances.

No problem so far. The appeals examiner himself conceded that the sexual harassment was "serious," but then observed that she had not quit because of it. Inferentially, then, had she done so, would he have found good cause and would he have awarded benefits? Most likely not. As the Department continues:

When an employee has viable options available to him, his voluntary termination without exploring those options does not constitute good cause for obtaining unemployment compensation.

The policy of the law is to encourage the employer and employee to adjust their differences and thus avoid interrupting the employment.

So, what did this working mother claimant do? She remained on the job, but reported the sexual harassment. What happened to her then is well-documented by her testimony and that of other witnesses willing to step forward on her behalf—notwithstanding the jeopardy to their jobs or future jobs which would attend testifying against the employer's interests. This testimony is in no way self-conflicting or contradictory. Jacklin did not put a single witness on the stand to rebut any fact testified to by Patricia Small or her witnesses. So, does she prevail? Not according to the Department, which in its brief states:

Good cause for resigning does not include purely personal and objective reasons unique to the employee but means conditions other than which by common knowledge is usual where accompanied by minor irritation.

An employee has the duty to try to find a reasonable alternative for solution to her problem within the employer's organization prior to termination of employment.

A personality conflict, standing alone, is not sufficient good cause to voluntarily leave one's employment.

Did the claimant "try to find a reasonable alternative for solution to *her* [anyone reading this opinion will fall in love with the Department's use of the word "her"] problem"? Of course, she did, and totally ignored and unmentioned in the decision of the appeals examiner, and as is pointed out, *supra,* and worthy of repetition:

Further, claimant also requested a transfer to another department when things became intolerable:

I did try to transfer over to another department, and that was on, that was also in the last two weeks in July. I tried to transfer to another department. Cas Hoffman, I talked to Skip Eller. Cas Hoffman was standing right there. He can verify this for me. That I tried to transfer to another department. Skip told me at that time there was no openings and it probably would be a couple months before I could be hired, hired on over there.

This requested transfer was verified by claimant's witness. These actions show that the claimant attempted to alleviate a difficult employment situation through company channels before she left. Only after these attempts to rectify the situation failed did the claimant voluntarily leave her job.

Again, as with the testimony of sexual harassment, in turn followed by just plain harassment, intimidation, and abuse, this testimony was not contradicted, not con-

flicting, and wholly unrebutted by Jacklin. For almost forty years now the law in this jurisdiction has been that stated in *Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 74 P.2d 171 (1937), where this Court held:

> The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial. (*Manley v. Harvey Lumber Co.*, 175 Minn. 489, 221 N.W. 913, 914.) In *Jeffrey v. Trouse*, 100 Mont. 538, 50 P.2d 872, 874, it is held that neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability. And, in *Arundel v. Turk*, 16 Cal. App.2d 293, 60 P.2d 486, 487, 488, the rule is stated thus:

"Testimony which is inherently improbable may be disregarded, but to warrant such action there must exist either a physical impossibility of the evidence being true, or its falsity must be apparent, without any resort to inferences or deductions.

The holding of *Pierstorff* has been consistently applied by this Court, as recently as in *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979). *Pierstorff* was a case which had been before the Commission (then the Industrial Board), and the Court was unanimous in its view that testimony cannot be so lightly disregarded as it was in that case, and flagrantly disregarded in this case, by the appeals examiner, by the Commission, and, worst of all, by this Court.

That which has been said as to claimant's corroborated testimony relative to transfer out of her lewd persecutor's department is equally applicable to the examiner's arbitrary and capricious avoidance of mention-ing claimant's explanation of her reason for not quitting earlier than she did, which was responsive to the examiner's own question, a question which in and of itself clearly demonstrated the direction the examiner would take in reaching a decision:

Q. How come you put up with this guy for so long, Ms. Small?

A. Because I have a family to support. And I, the way the job conditions are, it is very, very hard to find a job. I was totally aware of that when I left. . . . I have two small children to help support at the time. At the, the last two, the last week in August I had taken a week off to start divorce procedures. So I was totally aware I was going to have to support two children by myself on Jacklin's income, and I was determined I could do it.

Again *Pierstorff* applies. If *Pierstorff* is not going to continue as the law in these situations, the majority should throw it out, as a majority did in *Booth, supra*. All that is required to do so is a majority vote. If it is to remain, the opinion for the Court should be applying it in this case. It is difficult for me to be cognizant of the law, read this record, and swallow the examiner's conclusion that "claimant has not established [sexual harassment] as a reason for quitting . . ." and that "Many, if not most, of the claimant's complaints against the employer are trivial and appear to have been used as a justification for quitting after the decision was made for a different reason." The examiner does not deign to favor us with whatever was his surmise as to "a different reason." Absent something in the record, anything, and there is nothing, to support this prejudicial interjection, that alone should be sufficient grounds for setting aside the decision of the Commission which is simply to adopt the examiner's decision. While the examiner perhaps ought not be overly faulted for not being aware of the *Pierstorff* case, the Industrial Commission and this Court [3] especially are

---

3. *Pierstorff, supra*, is, of course, alive and well. It was recently cited by Justice Bakes writing

for a unanimous Court in *Goicoechea v. Blin-*

not able to utilize ignorance of that case as justification for not exercising independent evaluation of the cold written record. It cannot be gainsaid that there was no conflicting evidence placed before the examiner. In turn, the Commission and now this Court have access to the *same evidentiary facts* upon which the examiner acted. On those evidentiary facts, some of which the examiner did not mention in his decision, the examiner *found, concluded, ruled,* or *held*—choose whatever word you will—that Patricia Small did not have good cause to quit working at Jacklin. This Court sadly avoids interfering with this gross miscarriage of justice.

The Department of Employment argues that findings of fact of the Industrial Commission are binding on this Court, and that the Commission, on its review of the cold record, has found as a fact that Patricia Small did not have good cause to quit. Although the examiner and two of the Commissioners are entitled to be excused for not knowing and comprehending the distinction between evidentiary facts and ultimate facts, I would have thought that the members of this Court by reason of age alone would not be at such a loss. In law school, at least at Idaho, we were certainly exposed to that distinction, most often in connection with code pleading. In a contested case both parties introduce evidence favorable to their respective sides. Often it is diametrically opposed and cannot be reconciled, leaving it to the trier to determine just what is the fact of the matter, generally a matter of credibility and probability. The trier of fact has to make the determination as to what is found to be the fact of the matter. These are evidentiary facts. Once the evidentiary facts are ascertained, then the ultimate fact is arrived at. Sometimes this is stated as a conclusion, and sometimes as a ruling, as a finding, or a holding. Cases are legion from this Court recognizing, in civil cases from district court as well as those from commission, that findings are often misnamed as conclusions, and vice versa.

Anyone in the profession will concede at least some difficulty in making a true differentiation, and many practitioners and judges out of an abundance of caution have placed the same statement under conclusions of law.

A helpful observation was made by the Montana Supreme Court in *Mining Securities v. Wall*, 99 Mont. 596, 45 P.2d 302 (1935), where that court relied upon the text, *Bancroft's*, Vol. I, p. 914, stating that "it is quite easy to say that the ultimate facts are but the logical conclusions deduced from certain primary facts evidentiary in their character, and that conclusions of law are those presumptions or legal deductions which, the facts being given, are drawn without further evidence."

In Patricia Small's case there was no conflict in the evidence which had to be resolved. The unrefuted testimony which she gave plus that of her witnesses provided the primary evidentiary facts. The examiner's declaration that therefrom he "found" no good cause for her quitting Jacklin was as clear an example of stating the ultimate fact, or conclusion of law, or ruling, as anyone could hope to find. And as such, as has long been held, it is not binding on this Court. Why, in this particular case the majority who this day speaks for the Court does not deign to recognize that conclusions of the Commission are not binding upon us is beyond my ken.

Equally beyond my ken is what possessed the Court in *Booth, supra,* to gratuitously overrule *Phipps v. Boise Street Car Co.,* 61 Idaho 740, 107 P.2d 148 (1940). *Phipps,* as applicable here, had been the law in Idaho almost since the day Idaho enacted unemployment compensation law, which was done "for the purpose of securing for this state the maximum benefits of the Act of Congress, approved August 14, 1935, known as the 'Social Security Act.'" *Phipps,* 61 Idaho at 743, 107 P.2d at 148. To my knowledge, in almost forty years no one had ever questioned the holding in *Phipps* which *Booth* overruled, not any claimants, and not the Employment Securi-

*coe's Magic Valley Packing Co.,* 108 Idaho 403,    700 P.2d 25 (1985).

ty Agency, nor the Department of Employment. And, for certain, neither party in *Booth* suggested, inferred, or intimated that an overruling of *Phipps* was in order, or asked that it be overruled. This I say with the *Booth* record on appeal before me. In *Booth*, as here, the claimant was pro se, and wrote his own brief. The Department was represented by its counsel, and the City of Burley had counsel—both filing briefs in support of the Commission's decision which had overturned the decision of the senior appeals examiner for the Department, G.H. Oram, which awarded benefits to Mr. Booth. The Department, apparently satisfied with Mr. Oram's decision, did not seek review by the Commission—only the employer did so. The Commission reviewed the cold record sent to it from the Department, and with Commissioner Geddes not signing the decision, reversed the decision of the senior appeals examiner. Not then comprehending exactly what was occurring in *Booth*, I noted that the Court's opinion laboriously incorporated the findings of the Commission (in no wise different from those of the appeals examiner), noted also that the conclusions of the Commission were not set forth (which were only two in number, the first of which was not even a conclusion). The only conclusion of law relative to the facts found was No. II, which my opinion set out in a footnote. A terse conclusion, it stated only:

> The Commission finds that the claimant was discharged for actions which were in disregard of the employer's interests and of the instructions that had been given him at the time of his employment. The Commission concludes that the claimant's discharge was for misconduct in connection with his employment.

My purpose here is not to point out that *Booth* was wrongly and poorly decided. That was done beginning at p. 233 of 99 Idaho (p. 79 of 580 P.2d). The stage is being set for further analysis of *Booth* insofar as it overruled *Phipps*. Other than

for overruling *Phipps*, and putting aside the fallacies in the *Booth* opinion, this Court properly would have drawn its own conclusion, or made its own ultimate fact, as to whether or not that claimant was guilty of disqualifying misconduct. Rather than do so, where we were reviewing the same cold record reviewed by the Commission, the majority elected to preclude itself by refusing to follow forty years of precedent. Instead, gratuitously, it volunteered that as of that day:

> The court therefore declines to independently adopt findings of fact at variance with those of the Industrial Commission where such findings are supported by substantial and competent evidence in the record. Prior decisions suggesting a contrary result are, to this extent, hereby expressly overruled.

Having thus paved the way for not exercising any independent judgment of its own, and tossing out the window forty years of precedent which demonstrated quality judicial responsibility, the *Booth* majority had little trouble in summarily disposing of the appeal: "Having found that appellant *intentionally* disregarded his employer's rules and best interests no error was committed in the Industrial Commission's conclusions of law and order denying appellant's claim for benefits.[4] (Emphasis added.)

The *Booth* majority, in setting the stage for doing away with *Phipps*, quoted *this one sentence* from *Phipps*: "When the trier or triers of facts does not or do not hear and see the witnesses face to face, the findings of such tribunal are not necessarily and *ipso facto* of any greater cogency than those of any other tribunal." There was more to the *Phipps* decision than that one sentence. Justice Holden, writing for a unanimous Court, was not as casual as intimated, but used a careful and thorough *constitutional approach* in arriving at the *Phipps* rationale:

---

**4.** As stated, this is not to redecide *Booth.* But, it is difficult to refrain from mentioning that the Commission's findings, all of which were incorporated into the Court's opinion, did not include such language. Conclusion II did, to an extent. But, anyone finding the word "intentional" anywhere in the findings or conclusions should be entitled to a substantial reward.

As above pointed out the board did not itself hear and determine appellant's claim for compensation but heard and determined appellant's claim on a transcript of the evidence and proceedings had before Examiner Bradshaw. It could not, therefore, observe the appearance, demeanor, actions, manner, etc., of the witnesses called to the stand before the examiner, and that presents the question as to whether in these circumstances this court is bound by the decision of the board. Section 9, article 5, of our Constitution, as amended (1935 Sess.Laws 377; 1937 Sess.Laws 498), provides that:

"On appeal from orders of the Industrial Accident Board the court shall be limited to a review of questions of law."

Section 43–1401, I.C.A., provides that the procedure before the board shall be "as far as possible in accordance with the rules of equity."

Beginning with *Roby v. Roby*, 10 Ida. 139, 77 P. 213, this court held and has consistently adhered to the holding that:

"Since the trial judge did not see the witnesses upon the stand [the case having been referred to a referee to take testimony and report it to the court] and did not hear them testify, but determined the case on depositions, we are in as favorable a position to judge of their truthfulness and the weight to be given to the evidence as was the trial judge. In such case the rule that this court will not disturb the judgment where there is a conflict in the evidence does not apply." See, also, *Stoneburner v. Stoneburner*, 11 Ida. 603, 83 P. 938; *Spoffard v. Spoffard*, 18 Ida. 15, 108 P. 1054; *Parsons v. Wrble*, 19 Ida. 619, 115 P. 8, 13; *Jackson v. Cowan*, 33 Ida. 525, 196 P. 216; *McKenzie v. Miller*, 35 Ida. 354, 206 P. 505; *In re Rexburg Investment Co.*, 36 Ida. 552, 211 P. 552; *Estate of Peterson*, 38 Ida. 195, 220 P. 1086; *Estate of Tormey*, 44 Ida. 299, 256 P. 535; *Pioneer Irr. Dist. v. American Ditch Assn.*, 50 Ida. 732, 1 P.2d 196; *Keyes v. Keyes*, 51 Ida. 670, 9 P.2d 804; *Cannon v. Seyboldt*, 55 Ida. 796, 48 P.2d 406, all decided prior to the adoption of the constitutional amendment, *supra*.

The general principles of statutory construction apply to the interpretation of constitutions. (16 C.J.S., Constitutional Law, secs. 15–29; 12 C.J.S. 699–710, sec. 63.) It is therefore to be assumed the legislature, in presenting, and the people, in adopting, the amendment were familiar with the holdings above referred to and uniformly followed. (*Oregon Short Line R. Co. v. Pfost*, 53 Ida. 559, 576, 27 P.2d 877.) We must presume the amendment contemplated the law as it had been announced by this court. *Wright v. Callahan*, 61 Ida. 167, 99 P.2d 961.

When the trier or triers of facts does not or do not hear and see the witnesses face to face, the findings of such tribunal are not necessarily and *ipso facto* of any greater cogency than those of any other tribunal. Moreover, where the reason of the law ceases, the law itself also ceases. (*Beardsley v. City of Hartford*, 50 Conn. 529, 47 Am.Rep. 677; *Succession of Baker*, 129 La. 74, 55 So. 714, 719, Ann.Cas. 1912D, 1181; *Moore v. Sharpe*, 91 Ark. 407, 121 S.W. 341, 23 L.R.A., N.S., 937; *People v. Bloom*, 193 N.Y. 1, 85 N.E. 824, 826, 127 Am.St. 931, 936, 15 Ann. Cas. 932, 934, 18 L.R.A., N.S., 898, 901; 6 Words and Phrases 472 [Now 6A Words and Phrases 118].)

Furthermore, are we to assume that the amendment was intended to give greater sanctity to the findings of the Industrial Accident Board than to the findings of a district judge, based only on written testimony, not evidence given *ore tenus?* Such has not been historically the apparent theory of our law. (Secs. 30–1109, 61–1910, 11–303, 11–406, I.C.A.) We conclude that no greater weight should be given to findings of the Industrial Accident board than to those of a district court. Hence, unless the board or a majority thereof hears and sees the witness testify (the procedure fixed by the Workmen's Compensation Law), its findings are not, even under the constitutional amendment, in view of the above

holdings of the court, conclusive on this court nor so intended to be by the people. *Phipps, supra,* 61 Idaho at 746–48, 107 P.2d at 150–51.

Since the author of the *Booth* opinion placed in the proffered opinion for the Court only the one quoted sentence, it may be assumed that the other members of the Court saw no reason to engage in an independent reading of the *Phipps* opinion. I concede that I did not then do so. In this business, as a general proposition, at that time it was my belief that the members of this Court were as justified in relying upon the fairness and accuracy of quotations by the justice assigned the writing of a given case as we do in relying upon those in briefs of counsel. Would other members of this Court have joined the Court's opinion in *Booth* had they read *Phipps?* I would like to think not. This I say, one, because *Booth* should not have so lightly overruled that which our predecessors on the Court did forty years ago—unless exigent cause was shown for doing so, and unless the Court was being beseeched to do—neither of which reasons existed. Second, the *Phipps* Court was a respected Court. In addition to Justice Holden, Justice Ailshie, in the view of many Idaho's most able jurist, was on that Court, along with Justice Givens, Justice Budge and Justice Morgan, the latter not participating because his son-in-law, and later a justice, E.B. Smith, represented the claimant. It was a Court of stature, and it was a Court which dealt liberally, as the statement of purpose of this then novel social legislation directed. I can conceive of no reason, none whatsoever, for the overruling of that which the *Phipps* Court held—which was entirely in consonance with all precepts of Idaho law. I see every reason for continued adherence. The real holding of the *Phipps* Court was not to expand the scope of this Court's review on a cold record—*but to continue it* in light of the 1935 amendment to art. 5, § 9 of the Idaho Constitution. The basis for the decision to continue it was clearly set out in *Phipps,* and in language familiar to this Court even as presently constituted: "We must pre-

sume the [1935] amendment contemplated the law as it had been announced by this Court." *Phipps, supra,* at 747, 107 P.2d at 150.

The case of Patricia Small is illustrative. Under *Phipps,* and its progeny, this Court of five members would this day be using a collective wisdom and experience to make its own determination, on the same cold record which was before the Commission whether Patricia Small was justified in finally walking away from working circumstances so abhorrent that, so I submit, not one member of this Court or the Commission would tolerate the same for even one minute if it were a wife or daughter subjected thereto. What we have under *Booth* is a Court which, while as individuals who would undoubtedly stand aghast at what has transpired with this claimant, turns away rather than announce a decision which is at variance with that of the appeals examiner and endorsed by the Industrial Commission. Moreover, today the Court further avoids recognizing that such a decision is one of ultimate fact made upon disputed evidence. The message the Court sends out this day is that claimants may as well stay out of this Court because the magic of *Booth* has in such matters turned the Court into a powerless eunuch.

The injustice of today's decision is further exemplified by observing that had the claimant resided in another state, the harassment she endured while working for Jacklin might have netted her—not just unemployment compensation—but damages in the six digit range. In *Atwood v. City of Trenton,* Wayne County Circuit Court, No. 81 110 078 NO, (Mich.Oct.1983), the jury awarded the plaintiff $400,000 against a municipal police department from which the plaintiff was forced to resign because of sexual harassment on the job including the hanging of sexually explicit pictures on the wall, the telling of sexually explicit jokes, and unconsented touching of the plaintiff. Today, Patricia Small is denied even minimal compensation in the form of unemployment compensation benefits because the majority chooses to put off

to another day meeting the issue squarely presented. Patricia Small became unemployed in August of 1982. It was that long ago that she and her little children were in need of the benefits which the law provides, for which they had no need while Patricia Small toiled as a field hand. The Department rendered its final determination on the *17th day of November, 1982,* and the Commission concluded its appellate review in May of 1983 and settled the transcript for this Court's use. Now, two years later, a majority of this Court seizes upon a supposed technicality to put off any decision.

Over two years ago a final decision of the Industrial Commission denied any unemployment benefits to Patricia Small:

> The claimant has appealed to the Industrial Commission a Decision of an Appeals Examiner of the Idaho Department of Employment, finding her ineligible for unemployment insurance benefits. There has been no request for an 1972 Inspector's Code hearing pursuant to the Rules Practice and Procedure of the Commission. Therefore, the matter is deemed to be submitted to the Commission for decision on the record of proceedings before the Appeals Examiner, without further hearing. The Commission has reviewed the record and hereby adopts the Decision of the Appeals Examiner as the Decision of the 1972 Inspector's Code.

### ORDER

> IT IS HEREBY ORDERED, and this does order, that the Decision of the Appeals Examiner be, and the same is hereby, Affirmed.
> DATED and FILED this 26th day of January, 1983.

Patricia Small timely appealed—since which time her case has been in this Court. After briefs were filed by claimant and by DOE (Jacklin Seed Company did not file a brief but advised the Court of its willingness to ride along on the coattails of the DOE brief), all parties involved agreed that the case stands submitted on the record and on those briefs. Otherwise put, the

Court did not receive the benefit of oral argument, a proposition which I do not endorse. Any appeal important enough that it is retained in this Court, as against being assigned to the Court of Appeals, should be orally argued. To deaf ears I suggest that *this* Court should not send out notices that a given case has been retained, and in the same notice provide a place for counsel or pro se parties to agree to the waiver of oral argument.

Today, 28 months after the appeal was taken, and 14 months after the case was submitted for our decision, Justice Bakes has gathered unto himself a majority of the Justices who do not decide the appeal which has been presented and is (or should be, or long ago should have been) ripe for decision, but instead, without bothering to vacate or reverse the final decision of the Commission, declare that it is suddenly found required "to remand the case to the Industrial Commission for reconsideration...." In so doing it is gratuitously added that *"the Commission may well want to consider a new hearing to obtain an accurate record* from which to evaluate appellant's case...." The Commission, in making its appellate review, saw no inaccuracies in the record which it received from the Department which required a new hearing. None of the parties requested a new hearing, either at the Commission level or in this Court, and in fact waived the right to new testimony, or to present old testimony anew.

The majority's strange suggestion to the Commission is, of course, reminiscent of *Comegys v. Idaho Air Nat'l Guard,* 104 Idaho 767, 663 P.2d 648 (1983), another case where this Court neither vacated nor reversed the Industrial Commission, but *"remanded* to the Commission for the preparation of *its* findings of fact, conclusions of law and decision on the basis of the evidence already in the record or such additional evidence as the parties may desire to tender in an additional hearing before the commission." *Comegys, supra,* at 768, 663 P.2d at 649. There, too, the Court was faced with the embarrassing prospect

of holding in favor of a claimant. The factual findings of the Commission were unchallenged by either party. The Commission in fact had accepted the findings of its referee and adopted the same, but disagreed with the referee's legal conclusion that Comegys was entitled to benefits.

Where the same ploy is being here employed as in *Comegys*, it is important to note two things, (1) that nothing in *Comegys* justified this Court in directing the Commission to prepare *"its"* findings, and, (2) it was simply a ruse to, in a footnote at page 768, suggest, "strongly suggest" to the Commission, the taking of additional testimony to establish the majority belief "that the claimant may have held a dual status which in turn may bear upon a standard of conduct required of such a dual status employee." *Comegys, supra,* at 768 n. 1, 663 P.2d at 649 n. 1.

Justice Huntley, writing separately observed his preference "that we fully determine the appealable issues in favor of *Comegys* at this time." To which he added that "... there is *no testimony whatsoever* establishing any detriment to the Air National Guard caused by the issuance of the checks by Comegys." 104 Idaho at 768–69, 663 P.2d at 649–50.

Justice Bistline, also writing separately, addressed the supposed need of remanding for new findings of fact:

> For certain I question the supposed need for new findings of fact. Why? Simply because the Department concedes that the findings of the referee were left intact by the Commission, which is not only obvious from the state of the record, but supported by the two following colloquies between Court and counsel for the Department at presentation of oral argument:
>
> > JUSTICE HUNTLEY: Counsel, following that critical point up, don't the rules require that there be findings of

fact and conclusions of law and if, therefore, if the Commission doesn't want to accept the referee's findings they are duty bound to make their own findings and in this case they failed to do so.

MR. MARTINDALE: Are you asking me?

JUSTICE HUNTLEY: Yes, sir.

MR. MARTINDALE: It's my impression that what they did was simply disagree with the result. If you read the language they say we disagree with the result. I think they've basically based their conclusion on the findings of fact that have already been made by the referee and reached a different legal conclusion.

JUSTICE BISTLINE: That's my interpretation and one I'm willing to live with if you are.

MR. MARTINDALE: Oh, yes. They know that they need the findings of fact and I'm sure that they simply were relying on the findings made by the referee.

JUSTICE BISTLINE: But they changed the ultimate conclusion?

MR. MARTINDALE: Yes.

*Comegys, supra,* at 771, 663 P.2d at 652.

Although Justice Huntley in his *Comegys* opinion wrote in terms of judicial economy and the propriety of "sending the case back to the Industrial Commission *so it can enter findings* supposedly *supporting its conclusions* ...,"[5] 104 Idaho at 768, 663 P.2d at 649, I have always wondered if he comprehended the full flavor of footnote 1 of the majority opinion.

Having brought attention to the procedure-on-remand similarities which *Comegys* bears to Justice Bakes' majority opinion in this case, I return to this case, and in particularly to the reasoning which is offered up to explain not deciding the appeal which has been presented. Dealing in "ap-

---

5. There is no doubt that Justice Huntley is well aware that first the facts are to be found, and then conclusions can be made by applying principles of law to those facts. There, in *Comegys,* the majority liked the Commission's own ulti-

mate conclusion, but thought that the Commission should produce a statement of facts which would support it—an inverse and incorrect application of the true rule.

parentlys" and "indications," Justice Bakes has now discovered, 28 months after the case has been on appeal to this Court,[6] that:

> [A]pparently through inadvertence the Industrial Commission did not consider all of the evidence which was before the appeals examiner. *The record prepared by the Department of Employment and certified to the Industrial Commission contained nine exhibits, but two of the exhibits were not transmitted to the Industrial Commission.* The certificate of the Industrial Commission on appeal indicates that only Exhibits 1 through 7 were considered by the Industrial Commission in reviewing the Department of Employment's record. Thus, it appears that Exhibits 8 and 9, although required to be included in the record on appeal before the Industrial Commission, were never considered by the Industrial Commission in arriving at its decision. Exhibits 8 and 9 are not contained in the commission's record filed in this Court. (Emphasis added.)

Nothing in the certificate of the Industrial Commission "indicates" or substantiates "that only Exhibits 1 through 7 were considered by the Industrial Commission...." To the absolute contrary, there is this Certification of Record executed by the Secretary of the Commission and found in the appeal record at page 13. As pertinent, it reads:

> I further certify that all exhibits offered or admitted during the proceedings before the Industrial Commission are correctly listed on the Certificate of Exhibits, Page (a), and all exhibits offered or admitted during the proceedings before the Appeals Examiner of the Department of Employment are listed in the Index of the "Transcript on Appeal", which is included with the exhibits, as well as on the Certificate of Exhibits, Page (a). Said exhibits shall be lodged with the Supreme Court upon settlement of the Record herein.

> DATED at Boise, Idaho, this 14th day of April, 1983.

Certificate of Exhibits, page (a), referred to in the Certification of Record above set forth, is in the appeal record, and I submit it in full by photocopy:

### CERTIFICATE OF EXHIBITS

**DEPARTMENTAL EXHIBITS**

1. ✓ Claimant/Employer Separation Statement

2. ✓ Employer's Statement

3. ✓ Determination

4. ✓ Request for Redetermination

5. ✓ Employer's Reply

6. ✓ Redetermination

7. ✓ Appeal of Benefit Redetermination

✓ TRANSCRIPT ON APPEAL (Hearing before Appeals Examiner)

8. ✓

9. ✓

---

**6.** Justice Shepard once wrote that "this case demonstrates the great truth contained in that simple statement, 'justice delayed is justice denied.'" *Deshazer v. Tompkins,* 93 Idaho 267, 460 P.2d 402 (1969)

I, the undersigned Secretary of the Industrial Commission, do hereby certify that the foregoing is a true and correct list of all exhibits offered or admitted into evidence during the proceedings before the Department of Employment and during the proceedings before the Industrial Commission.

DATED at Boise, Idaho, this 14th day of April, 1983.

*Patricia J. Ramey*

Patricia S. Ramey, Secretary

---

The index to the transcript on appeal, to which reference is also made in the Commission's Secretary's Certification of Appeal, pertinent part first above photocopied, shows the witnesses who testified in proceedings before the Department's appeals examiner, and *also lists the exhibits which were introduced.* Again I present a photocopy:

## I N D E X

| PATRICIA J. SMALL - Claimant | page | line |
|---|---|---|
| Direct by the Examiner | 3 | 26 |
| Cross by Marilyn Deutsch | 25 | 17 |

| CAS HOFFMAN - Claimant Witness | | |
|---|---|---|
| Direct by the Examiner | 28 | 7 |

| SANDRA SEMANKO - Claimant Witness | | |
|---|---|---|
| Direct by the Examiner | 31 | 28 |
| Direct by Patricia Small | 34 | 10 |
| Cross by Marilyn Deutsch | 35 | 5 |

| VICKI WOLKENHAUER - Claimant Witness | | |
|---|---|---|
| Direct by the Examiner | 36 | 29 |
| Direct by Patricia Small | 37 | 7 |
| Cross by Marilyn Deutsch | 37 | 27 |

| MARILYN DEUTSCH - Employer | | |
|---|---|---|
| Direct by the Examiner | 38 | 36 |
| Cross by Patricia Small | 41 | 31 |

## E X H I B I T S

| 1. | I-77-501 | 8/12/82 | Claimant/Employer Separation Statement |
|---|---|---|---|
| 2. | I-77-501 | 8/18/82 | Employer's Statement |
| 3. | I-77-505-A | 8/26/82 | Determination |
| 4. | I-77-515A | 9/8/82 | Request for Redetermination |

| | | | |
|---|---|---|---|
| 5. | | 9/13/82 | Employer's Reply |
| 6. | I-77-515B | 9/28/82 | Redetermination |
| 7. | I-51-570 | 10/5/82 | Appeal of Benefit Redetermination |
| 8. | pgs. 1 through 5 | | Temporary Employees' Handbook |
| 9. | | | Photocopies of Pictures |

On the same date as the Certification of Record, April 14, 1983, the Secretary also mailed to the involved parties the following Notice, portions of which I have underscored:

NOTICE OF COMPLETION OF RECORD AND TRANSCRIPT

TO:    FREDERICK C. LYON, Clerk of the Supreme Court:

TO:    PATRICIA J. SMALL, Claimant:

TO:    JACKLIN SEED COMPANY, Employer, and DONALD W. JACKLIN, Pro Se:

TO:    DEPARTMENT OF EMPLOYMENT and CAROL L. BRASSEY, its attorney:

The Clerk's Record on appeal has this date been completed and is ready for filing in Supreme Court No. 14994.

I hereby certify that on this date I personally delivered a copy of the Clerk's Record to the above-named attorney for the Department of Employment, and I further certify that on this date I placed two copies of said Record in the U.S. Mail, postage prepaid, addressed as follows:

Patricia J. Small
5199 N. Eastland
Newman Lake, WA 99025

Donald W. Jacklin
West 5300 Jacklin Ave.
Post Falls, ID 83854

You are further notified that, pursuant to Rule 29(a), Idaho Appellate Rules, all parties have twenty-one days from this date within which to file objections to the Record, including requests for corrections, additions, or deletions. In the event no objections to the Clerk's Record are filed within said twenty-one day period, the Record shall be deemed settled.

DATED at Boise, Idaho this 14th day of April, 1983.

_Patricia S. Ramey_
Patricia S. Ramey, Secretary

Twenty-one days elapsing without any objections, Commissioner Defenbach then entered the Commission's order settling the record and the transcript:

## IN THE SUPREME COURT OF THE STATE OF IDAHO

| | |
|---|---|
| PATRICIA J. SMALL,<br>SSA 564 31 3675, | )<br>)<br>) |
| Claimant-<br>Appellant, | )<br>)<br>) SUPREME COURT NO. __14994__ |
| vs. | )<br>) |
| JACKLIN SEED COMPANY, | )<br>) |
| Employer-<br>Respondent, | )<br>) |
| and | ) **ORDER SETTLING RECORD AND** |
| STATE OF IDAHO,<br>DEPARTMENT OF EMPLOYMENT, | )<br>) **TRANSCRIPT ON APPEAL**<br>) |
| Respondent. | )<br>) |

The time for filing objections or requesting corrections or amendments to the transcript or record in the above-entitled matter having expired, and no objections or requests for corrections or amendments having been filed,

IT IS NOW THEREFORE ORDERED that the foregoing record and transcript be, and the same are, hereby settled and allowed as the record and transcript of proceedings in this matter in accordance with Rule 29(A) of the Idaho Supreme Court.

DATED and FILED at Boise, Idaho, this 5th day of May 1983

INDUSTRIAL COMMISSION

_____
(Commissioner)

Against the foregoing array of documentation, Justice Bakes for the majority makes the bald assertion that "the Industrial Commission did not consider all of the evidence which was before the appeals examiner." This is amazing!—to say the least. Moreover, it casts the lie in the teeth of the Commission which in its decision and order, *supra*, states: *"The Commission has reviewed the record* and hereby adopts the Decision of the Appeals examiner as the Decision of the Industrial Commission." Where the Commission declares that it has read the record, and where that record itself lists the exhibits which were considered by the Department's appeal examiner, and where that list includes Exhibits 8 and 9, it ill-behooves this Court, or any court, to insinuate, on the strength of "appears," "apparently," and "indications," that the Commission is guilty of an untruth. In any circumstance that is **BAD**, but such denigration coming from the State of Idaho's highest court as a pretext for what "appears" to be an "indication" of a cop-out as against reversing and holding in

favor of claimant, is an outrage. If the Commission is thought to be guilty of declaring that it has reviewed exhibits which it has not reviewed, a far better practice would be to ascertain that fact, and allow the Commission to declare the error in its ways. For my part, I am not only satisfied to rely upon the integrity of the Commission, but am *bound* by the recitations in its Final Order and Decision. "The record of a judgment is presumed to speak the truth; express recitals therein import verity. If the record states what was done, it may not be presumed that something different was done, a presumption never arises that a recital of facts in the record is incorrect." 46 Am.Jur.2d Judgments § 40. Recitals in record. In unemployment cases, the Industrial Commission is an appellate court. *See also, Weil v. Defenbach,* 36 Idaho 37, 43, 208 P. 1025, 1026 (1922): "It is generally held, however, that where a judgment of a court of general jurisdiction contains recitals as to the jurisdictional facts, these are deemed to impart absolute verity unless contradicted by other portions of the record." Nor is this Court handicapped by any omission of Exhibits 8 and 9, copies of which are readily available in the original file in the office of the clerk of this Court. While it is not unlikely that the originals of those exhibits may have been first delivered to the Department by the Commission Secretary when she certified that she "personally delivered a copy of the Clerk's Record to the above-named attorney for the Department of Employment," Notice of Completion of Record and Transcript, *supra* (The Industrial Commission and the Department of Employment share the same building), it is also true that the originals of Exhibits 8 and 9 were *over fourteen months ago* transmitted to this Court's clerk who, on direction of the Court, returned the originals—one would suppose as being though unnecessary, where all briefing was in and the parties had waived oral argument.

Neither exhibit is referred to in the brief of the Department of Employment. Patricia Small's *pro se,* three and one-half page brief filed in this Court makes no reference to Exhibits 8 or 9. The Temporary Employee's Handbook, Exhibit 8, got into the record only in response to this question from the appeals examiner: "Q. ... Do you have a document there that shows what the employer's grievance procedures are?" Patricia Small said that she did, and then: "Q. Okay. Ms. Small, did you want to have that admitted into evidence? A. Yes, I do." The pictures of employees, Exhibit 9, found their way into the record in the same way, with the examiner asking Patricia Small:

Q. Do you have any other documents?

A. The pictures.

Q. Pictures of what?

A. Pictures that Ray had taken of us girls (inaudible) bent over.

Q. Okay. Ms. Small, again, if you'll send those to me today, along with the temporary handbook of 1982, I'll admit those into evidence as Exhibits 8 and 9.

A. Okay.

The only reference to Exhibits 8 and 9 in the decision of the appeals examiner is to note on page 2 that the two exhibits were admitted into evidence. Nothing more. Those exhibits are entirely superfluous to the issue presented on the appeal.[7] Any member of the majority who would urge to the contrary is as free to review the exhibits as am I, and equally to point out where I err in declaring them superfluous.[8] A

---

7. Claimant's testimony, which was unrefuted, was simply corroborated by the pictures. "A. Yes, still some here. He was constantly calling us 'his' girls. And putting his arm around us. Patting us on the butt. Calling us Jacklin whores as in prostitute. Taking pictures of our butts. Butt shots, hip shots." Tr., p. 12. The pictures are exactly as Patricia Small verbally portrayed them, no more, no less.

8. While a copy of Exhibit 8 could be appended to this opinion, it would not arouse any interest other than perhaps one of antipathy toward the reprehensible invasion of the privacy of hapless female field hands whose work required bent-over positions. Exhibit 9's only possible pertinency is this final paragraph:

*All of Jacklin Seed Company's foremen are qualified to handle work related situations, including safety, procedure, and **interpersonal relationships**. Please consult your fore-*

*pro se* claimant was asked if she had them, and if she would offer them, and she complied. As further evidence of their lack of any probative value, the legal representative for Jacklin Seed made not the slightest objection.

Entertaining a high regard for the entire legal staff of the Department, I will be greatly surprised if the Court does not receive a petition for rehearing from it, as well as from the claimant, requesting the Court to meet the issue, however it is to be decided.

## ADDENDUM

After the foregoing was written and circulated to the Court membership, Justice Bakes has responded by a footnote incorporated into his opinion. As I read it, the main thrust of the footnote, found in its final sentence, is to complain that "the dissenting opinion misconstrues the record before this Court." That assertion is backed on its author's pontifical declaration that the "record ... conclusively establishes that Exhibits 8 and 9 were not before the Industrial Commission." Prior to the footnote, Justice Bakes saw "indications that the Commission had "apparently" failed. My response is that the majority should use the occasion to read that which I have written at page 45, where it was thought I was the first to establish that the originals of the exhibits did not initially accompany the clerk's transcript. If Justice Bakes convinces three other members of this Court that those exhibits were never considered by the Industrial Commission, then he has also persuaded them that the Commission has rubber-stamped the decision of the Department's appeals examiner without making the review of the record which their final order recites was made. When I pick up the transcript which was certified to this Court from the Commission, when I read that transcript, I will be reading from the same transcript which the Commission had in its hands. When I be-

gin my reading of that transcript, unless I start (and finish) at the end of it, I will read the Index. All of this has come to pass. I have read the Index.

Justice Bakes, who has generally achieved some reknown for his regard for adherence to the law, in this particular instance, however, chooses to wage a collateral attack on the recitations of the Industrial Commission's final order—notwithstanding that those recitals "are deemed to impart absolute verity unless contradicted by other portions of the record." 46 Am. Jur.2d § 40. There are no contradictions in the record which we received from the Commission.

Justice Bakes has then turned to other and collateral evidence—entirely *aliunde* the record which the Commission transmitted to us. He favors us with another of his apparently's—"that the two handwritten numbers, 8 and 9, were added by personnel in the Supreme Court Clerk's Office." Until today I had no knowledge that the clerk's office had any authority to alter transcripts or exhibits which were transmitted to that office. Justice Bakes gives us the hearsay statement in our clerk's letter that "Pat Ramey of the Industrial Commission advised me that those documents were not included as exhibits before the Commission." Pat Ramey is, of course, the Secretary for the Commission. Whether she has authority to say for it that it did not have before it the exhibits which are listed in the Index is not my concern. I do not accept the proposition that such unsworn hearsay upon hearsay can mount to the level of upsetting the solemn recital of the Commission's final order. The larger point to be made, however, putting aside the use of hearsay, if all of the same is true, no one has explained why the Commission did not itself petition this Court to remand the cause to the Commission so that it could then do what it declared itself as having done in the recital of its final order? Nor has it been ex-

---

*man and he/she can help you answer your questions and solve your problems.*

Ray Perry was Patricia Small's foreman. His qualifications on interpersonal relationships is a proposition I leave to the reader.

plained why the Department of Employment did not urge the Commission that it do so? Why did both the Commission and the Department stand by and allow this Court to embark upon a determination of the cause on the merits—if in truth both knew that the Commission had been furnished a record which was not complete?

Justice Bakes relates the matter of the Department's motion to augment. This is nothing new, at least to me. My memory is not short. Mine was the only vote to not reject the augmentation. I know not why the other members of the Court voted against allowing augmentation. Pure surmise is that the two exhibits, 8 and 9, were of so little probative value that they weren't required. I have previously addressed that proposition. Justice Bakes points to the affidavit of a Betty Silberg. This affidavit is not part of the record certified to this Court by the Commission. Betty Silberg swears that she "failed to forward Exhibits 8 and 9 to the Commission." The explanation for the failure must be considered magnificent when one realizes the depth of the legal staff at the Department, and the detail of her excuse—which was merely "through inadvertence." Justice Bakes declares this to be an "uncontested record demonstrating that exhibits 8 and 9 were not before the Industrial Commission. To which I enter a demurrer, which in code pleading was understood to be a "so what?" That Justice Bakes has made not the least effort to demonstrate that exhibits 8 and 9 (not to forget that our original file contains copies of them) were integral to the decision of the appeals examiner, integral to the decision of the Commission, or integral to a decision on the merits from this Court. Obviously when four members of this Court voted against augmentation over 14 months ago, the exhibits were deemed unnecessary. Otherwise 14 months ago the Court would have *then* remanded to the Commission, if convinced—as I am not—that collateral sworn and unsworn hearsay may be freely used to impeach the recitals of a final order.

The trial bar undoubtedly and correctly will surmise that this Court has not indolently let the case lay fallow all this time, but that we would be mindful of the provisions of I.C. § 72–724(3), and even it be deemed inapplicable that we do not ponder forever on cases where unemployed workers who have been denied benefits are awaiting our decision. There will be those who in keeping abreast of our opinions full well realize that there are divergent philosophies on the Court where unemployment benefits are concerned. In short, anyone will know that in the —— months since this case was first taken under advisement, we have been wrestling with the merits, and not with a *sua sponte* remand to the Commission.

The whole thrust of my dissent is not at all that at which Justice Bakes has taken aim. Being ever mindful of the public policy declaration of I.C. § 72–1302 that unemployment is a subject of national and state interest and concern "which requires appropriate action ... to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family," I join others who will be outraged at the Court's opinion which not only avoids the merits by now requiring the Commission to reconsider the appeal from the Department's appeals examiner, but has the unmitigated gall to suggest to the Commission that it may want to conduct the hearing anew. As I have previously said, this is too much for my blood.

Realizing that some parts of my opinion might evoke a response, any hope that Justice Bakes would convince me that the exhibits which he concludes the Commission never saw were of such importance that this Court cannot proceed to conclude a dispositive appellate review has now evaporated. Earlier I pointed out that the exhibits were so meaningless that it was thought not necessary to append the same. Now, because that important point has evoked no response, I append hereto copies of exhibits 8 and 9. The reader may determine for himself the materiality of the exhibits.

Patricia Small both in proceedings before the Commission and in this Court has gone

it alone against the might and wealth of the state and federally financed Department of Employment. The malfeasant employer, Jacklin Seed Company, has throughout had a free ride provided it by the Department of Employment. One member of this Court has expended a vast amount of time and energy writing an opinion which, with or without the exhibits which may or may not have been before the Industrial Commission, should satisfy 100 percent of those who read it, that Patricia Small is *now*, at long last, entitled to benefits. The ploy which I find so lamentable and bad appellate practice on the part of the majority is that if the Commission succumbs to the wiles of the majority, the way has been paved so that the employer can now rally to the side of the Department and supply it with the lawyers and witnesses who may be able to create a conflict in the evidence. It is grossly unfair. The employer had its opportunity almost three years ago, and declined it. Moreover, can it reasonably be expected that at this late date Patricia Small's witnesses can be found, or if found, will again step forward to testify on her behalf?

There may be those who wonder that I have written at length on a little case. To such I say "Ask Patricia Small if in her eyes it is a little case."

*Department of ~~the~~ Employment*

## JACKLIN SEED COMPANY

### TEMPORARY EMPLOYEES' HANDBOOK

*I would like to say - that this Temporary hand Book was the only thing any of us girls recieved. We did not know anything about the Affirmative Action Plan - untill after I quite - only what is in this Book. Willie Becker, at Jacklin Seed Co. has the Conplaint we filed on Rec. and you can Call to Varify.*

This handbook is a compilation of useful information for temporary and seasonal employees of Jacklin Seed Company.

---

## TEMPORARY EMPLOYEES

WELCOME to Jacklin Seed Company. This handbook is designed to answer some of the questions you might have relating to your employment. If you don't find the answers here, feel at ease to ask your foreman to assist you. If your question requires the department manager's advice, he/she will be happy to answer any questions you may have.

| DEPARTMENT | FOREMAN |
|---|---|
| Farm | Don Jacklin, Skip Allert, Tom Pyle, Chappy Burgger |
| Maintenance Shop | Gene Kicha |

| DEPARTMENT | FOREMAN |
|---|---|
| Plant Department | Ted Dionne, Larry Noll, Jerry Gilbert, Ed Schofield, Alice Anderson |
| Research | Leah Brilman, Ray Perry |
| Data Processing | Willie Becker |
| Office | Marilyn Deutsch |

## PAY

Jacklin Seed Company has bi-weekly pay periods extending from Sunday of the first week through Saturday of the second week. Your time cards are picked up, verified, and routed to the payroll department by your department head. Time clocks are used in the mills and warehouse. You are paid in 15-minute increments. You must punch into the time clock when reporting to, and leaving from work. If you leave the Jacklin compound at any time, you must check in and out on the time clock.

If you have any questions about your check or the use of the time clock, please ask your foreman.

Checks are distributed on the Tuesday or Wednesday following the end of each pay period.

## WORKING HOURS *(Except for ranch employees)*

The standard work day is 7:30 AM to 4:00 PM—shift work will be as determined. All wages over 40 hours per week are paid at time and one-half.

Working hours for ranch employees will vary depending on the season of the year. All hours worked on the ranch are paid on a straight time basis.

## PARKING

Park in assigned parking areas. Do not park near buildings or in roadways.

## ATTENDANCE

You are required to be accountable to your foreman for your work attendance. If you are unable to report to work, your foreman must be called. Your employment will be terminated if you are unable to report to work and fail to call your foreman.

## WORK BREAKS

The company is not required to give work breaks. It is left to the discretion of your foreman to determine if a work break is needed.

Some jobs require eating on the job. You will be paid for your lunch break if you are required to eat on the job.

## WEARING APPAREL

You are required to wear proper clothing for your job. Your clothing must not constitute a safety hazard.

## TRAVEL

When you must travel from one area to another after starting work, transportation is usually furnished by the company. If authorized by your foreman, you may be asked to use your car and you will be reimbursed at a rate of 15 cents per mile.

## TIME LOSS

If you have *worked* for *more than one season,* you are *entitled* to *holiday pay* but *not vacation* or *sick pay.* You must *work the day before* and the *day after* a *holiday* to be *eligible for holiday pay.*

## MEDICAL

If you are returning for your second year or more, you may, at your option, enroll in the company's medical program offered

through Medical Service Corporation of Spokane County. You must pay for all costs of the medical program.

## ON–THE–JOB INJURIES OR ACCIDENTS

You are covered by state industrial insurance. To qualify for industrial insurance, you must immediately report all injuries, no matter how slight, to your foreman. Failure to report your on-the-job injury immediately will put any claims you have in jeopardy.

## SMOKING

All work areas have specified smoking areas. You may smoke in those areas only.

## SAFETY

An active safety program is in force. All job areas are checked closely to insure safe operating conditions. All equipment is maintained in the safest possible condition. Monthly safety sessions are required for all employees. If you believe any equipment unsafe, or see an unsafe practice, please notify your supervisor and appropriate actions will be taken. Safety is everyone's concern!

## TELEPHONE

All areas of the company are available by telephone. Personal calls are to be limited to important situations only. In some locations, due to the number of people involved, personal calls must be of an emergency nature only. Please remember that the intracompany communication lines must be kept open at all times.

## OPERATION OF EQUIPMENT

You will not be permitted to operate warehouse equipment without proper training by a qualified supervisor. Company vehicles can be operated only by licensed drivers who are approved to operate the vehicle in question.

*All* of *Jacklin Seed Company's foremen* are *qualified* to *handle work related situations*, including *safety, procedure*, and *interpersonal relationships. Please consult* your *foreman* and *he/she* can *help you answer your questions* and *solve your problems.*

Thank you,

MANAGEMENT

JACKLIN SEED COMPANY